Eric A. Liepins
ERIC A. LIEPINS, P.C.
12770 Coit Road
Suite 850
Dallas, Texas 75251
Ph. (972) 991-5591
Fax (972) 991-5788

ATTORNEYS FOR DEBTOR

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE | § § | |
| INDEPENDENCE FUEL SYSTEMS, LLC | § § § § § | Case no.22-60301-11 |
| | § | CHAPTER 11 |
| DEBTOR | § | |

**PLAN OF REORGANIZATION OF INDEPENDENCE FUEL SYSTEMS, LLC
PURSUANT TO SECTION 1190
OF THE BANKRUPTCY CODE DATED OCTOBER 12, 2022**

TO:  ALL PARTIES-IN-INTEREST, THEIR ATTORNEYS OF RECORD AND TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

I
INTRODUCTION

Identity of the Debtors

Independence Fuel Systems, LLC ("Debtor") filed its voluntary Chapter 11 case in the United States Bankruptcy Court for the Eastern District of Texas, Tyler Division ("Court") on July 13, 2022. The Debtor operates 6 unmanned compressed natural gas fueling stations around Texas. The Debtor proposes to restructure its current indebtedness and continue its operations to provide a dividend to the creditors of Debtor.

## Explanation of Chapter 11

Chapter 11 is the principal reorganization chapter of the Code. There are different types of Chapter 11 designations. In this case, the Debtor has chosen to proceed under a Subchapter V- Small Business Debtor Reorganization ("Subchapter V"). Pursuant to a Subchapter V Chapter 11, a debtor is authorized to reorganize its business for its own benefit and that of its creditors and equity interest holders. Formulation of a plan of reorganization is the principal purpose of a Chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in the debtor. After a plan of reorganization has been filed, it must either be accepted by holders of claims against, or interests in, the debtor, or be found by the Court not to discriminate unfairly and that it is fair and equitable with respect to each class of claims or interests that is impaired under the plan that has not accepted the plan.

## Explanation of the Process of Confirmation

Acceptance of the plan by the Creditors and Equity Interest Holders is important. In order for the plan to be accepted by each class of claims, the creditors that hold at least two thirds (2/3) in amount and more than one-half (½) in number of the allowed claims actually voting on the plan in such class must vote for the plan and the equity interest holders that hold at least two-thirds (2/3) in amount of the allowed interests actually voting on the plan in such class must vote for the plan. As set forth above, a Subchapter V Chapter 11 does not require that each holder of a claim against, or interest in, the debtor vote in favor of the plan in order for it to be confirmed by the Court.

Confirmation of the plan discharges the debtor from all of its pre-confirmation debts and liabilities except as expressly provided for in the plan and Section 1141(d) of the Code. Confirmation makes the plan binding upon the debtors and all claimants, equity interest holders and other parties-in-interest, regardless of whether or not they have accepted the plan.

### Voting Procedures

**Unimpaired Class**. Claimants in Classes 1 and 8 are not impaired under the Plan. Such Classes are deemed to have accepted the Plan.

**Impaired Classes**. The Class 2 through 7 Claimants are impaired as defined by Section 1124 of the Code. The Debtor is seeking the acceptance of the Plan by Claimants in Classes 2 through 7. Each holder of an Allowed Claim in Classes 2 through 7 may vote on the Plan by completing, dating and signing the ballot sent to each holder and filing the ballot as set forth below.

For all Classes, the ballot must be returned to Eric A. Liepins, 12770 Coit Road, Suite 850, Dallas, Texas 75251. In order to be counted, ballots must be **RECEIVED** no later than at the time and on the date stated on the ballot.

### Best Interests of Creditors Test

Section 1129(a)(7) of the Code requires that each impaired class of claims or interests accept the Plan or receive or retain under the Plan on account of such claim or interest, property of a value as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code. If Section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the Plan, on account of such claim, property of a value, as of the Effective Date of the Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims. In order for the Plan to be confirmed, the Bankruptcy Court must determine that the Plan is in the best interests of the Debtor's creditors. Accordingly, the proposed Plan must provide the Debtor's creditors with at least as much as they would receive in a Chapter 7 liquidation. It is anticipated that in a Chapter 7 liquidation, the Debtor's creditors, other than the secured creditors, would receive nothing. Accordingly, since the Plan proposes a substantial dividend to all creditors, such creditors are receiving more than they would receive in a Chapter 7 liquidation. Accordingly, the Plan satisfies the requirements of Section 1129(a)(7).

### ARTICLE II
### DEFINITIONS

Unless the context otherwise requires, the following capitalized terms shall have the meanings indicated when used in this Plan which meaning shall be equally applicable to both the singular and plural forms of such terms. Any term in this Plan that is not defined herein but that is used in title 11, United States Code ("Code") shall have the meaning assigned to such term in the Code.

1. "**Administrative Claim**" shall mean those Claims entitled to priority under the provisions of Section 507 of the Code, pursuant to a claimed and allowed administrative expense priority under Section 503(b) of the Code.

2. "**Allowed Claim**" as to all Classes, hereinafter specified, shall mean a Claim against Debtor (a) for which a Proof of Claim has been timely filed with the Court by the Bar Date, or, with leave of the Court and without objection by any party-in-interest, late-filed and as to which neither the Debtor nor any party-in-interest files an objection or as to which the Claim is allowed by Final Order of the Court, or (b) scheduled in the list of creditors, as may be amended, prepared and filed with the Court pursuant to Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, as to which no objection to the allowance thereof has been interposed through closing of this case, or as to which any such objection has been determined by an order or judgment which is

no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending. This category includes all Claims deemed unsecured pursuant to §506(a) of the Code. When "Allowed Claim" is used in the context of a Secured Claim, the provisions of §506(b) of the Code shall also apply.

3. **"Allowed Secured Claim"** shall mean an Allowed Claim secured by a lien, security interest, or other encumbrance on the properties owned by the Debtor, which lien, security interest, or other encumbrance has been properly perfected as required by law, to the extent of the value of the property encumbered thereby. That portion of such Claim exceeding the value of the security held therefor shall be an Unsecured Claim, as defined below and determined pursuant to 11 U.S.C. §506(a).

4. **"Allowed Unsecured Claim"** shall mean an unsecured Claim against Debtor (a) for which a Proof of Claim has been timely filed with the Court by the Bar Date, or, with leave of the Court and without objection by any party-in-interest, late-filed and as to which neither the Debtor nor any party-in-interest files an objection or as to which the Claim is allowed by Final Order of the Court, or (b) scheduled in the list of creditors, as may be amended, prepared and filed with the Court pursuant to Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, as to which no objection to the allowance thereof has been interposed through closing of this case, or as to which any such objection has been determined by an order or judgment which is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending. This category includes all Claims deemed unsecured pursuant to §506(a) of the Code.

5. **"Bar Date"** shall mean the date fixed by the Court as the last date for filing all Claims in this case other than Administrative and Priority Claims or Rejection Claims.

6. **"Case"** shall mean this Chapter 11 case.

7. **"Claim"** shall mean any right to payment from the Debtor as of the date of entry of the Order Confirming Plan whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or can be asserted by way of set-off. Claim includes any right or cause of action based on a pre-petition monetary or non-monetary default.

8. **"Claimant"** shall mean the holder of a Claim.

9. **"Class"** shall refer to a category of holders of Claims or interests which are "substantially similar" as provided for in Section 1122 of the Code.

10. **"Code"** shall mean the United States Bankruptcy Code, being title 11 of the United States Code, as enacted in 1978 and thereafter amended.

11. **"Confirmation"** or **"Confirmation of this Plan"** shall mean entry by the Court of an Order confirming this Plan at or after a hearing pursuant to Section 1129 of the Code.

12. **"Confirmation Date"** shall mean the date on which the Court enters an Order confirming this Plan.

13. **"Court"** shall mean the United States Bankruptcy Court for the Eastern District of Texas, Tyler Division, presiding over this Chapter 11 reorganization case, or any successor court of competent jurisdiction.

14. **"Creditor"** shall mean any person having a Claim against Debtor.

15. **"Debt"** shall mean any obligation of Debtor, alone, and any obligation of Debtor and any other Person, to any Entity.

16. **"Debtor"** shall mean Independence Fuel Systems, LLC.

17. **"Disbursing Agent"** shall mean the Reorganized Debtor or in the event of a confirmation under 11 U.S.C. §1191(b) shall mean the Sub-Chapter V Trustee.

18. **"Effective Date"** shall mean thirty days after the Final Confirmation Date.

19. **"Entity"** shall include Person, estate trust, governmental unit and the United States Trustee.

20. **"Equity Interest Holders"** shall mean holders of the equity interests in the Debtors.

21. **"Final Confirmation Date"** shall mean that date which is fourteen (14) days following the entry of the Order Confirming Plan, during which period of time no Notice of Appeal is filed, or if a Notice of Appeal is filed, during which period of time no Motion for Stay Pending Appeal is granted or supersedeas bond is approved and filed.

22. **"Order Confirming Plan"** shall mean the Order of the Court determining that this Plan meets the requirements of Chapter 11 of the Code and is entitled to confirmation under Chapter 11 of the Code.

23. **"Petition Date"** shall mean the date on which the Debtor filed this proceeding, July 13, 2022.

24. **"Plan"** shall mean this Plan of Reorganization in its present form or as it may be amended, modified or supplemented.

25. **"Priority Claim"** shall mean any Claim entitled to priority pursuant to Section 507(a) of the Code except for Tax Claims and Claims incurred by the Debtor post-petition in the ordinary course of business.

26. **"Rejection Claim"** shall mean any Claim arising out of the rejection of a lease or executory contract pursuant to Section 365 of the Code, which Claim shall be treated as an Unsecured Claim.

27. **"Reorganized Debtor"** shall mean the entity which shall assume title to and control of the Debtors' assets and liabilities upon confirmation as provided herein.

28. **"Secured Claim"** shall mean an Allowed Claim secured by a lien, security interest, or other encumbrance on the properties owned by the Debtor, which lien, security interest, or other encumbrance has been properly perfected as required by law, to the extent of the value of the property encumbered thereby. That portion of such Claim exceeding the value of the security held therefor shall be an Unsecured Claim, as defined below and determined pursuant to 11 U.S.C. §506(a).

29. **"Sub-Chapter V Trustee"** shall be that person appointed under 11 U.S.C. §1183.

30. **"Substantial Consummation"** shall occur upon Reorganized Debtor's commencement of payments to creditors as provided in this Plan.

31. **"Tax Claims"** shall mean any Claim entitled to priority under Section 507(a)(8) of the Code and shall include the claims of taxing authorities for taxes owed on the property retained by the Debtor under this Plan.

32. **"Unsecured Claim"** shall mean any Allowed Claim, whether or not liquidated or contingent other than a Priority Claim, a Tax Claim, or a Secured Claim.

III
REPRESENTATIONS

NO REPRESENTATIONS CONCERNING THE DEBTOR IS AUTHORIZED BY THE DEBTOR OTHER THAN THOSE SET FORTH IN THIS PLAN. THE DEBTOR RECOMMENDS THAT ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH IS NOT CONTAINED IN THIS PLAN SHOULD NOT BE RELIED UPON BY YOU IN REACHING YOUR DECISION ON HOW TO VOTE ON THE PLAN. ANY REPRESENTATION OR INDUCEMENT MADE TO YOU NOT CONTAINED HEREIN SHOULD BE REPORTED TO THE ATTORNEYS FOR DEBTOR WHO SHALL DELIVER SUCH INFORMATION TO THE COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

ANY BENEFITS OFFERED TO THE CREDITORS ACCORDING TO THE PLAN WHICH MAY CONSTITUTE "SECURITIES" HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE FEDERAL SECURITIES AND EXCHANGE COMMISSION ("SEC"), THE TEXAS SECURITIES BOARD, OR ANY OTHER RELEVANT GOVERNMENTAL AUTHORITY IN ANY STATE OF THE UNITED STATES. IN ADDITION, NEITHER THE SEC, NOR ANY OTHER GOVERNMENTAL AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PLAN. ANY REPRESENTATIONS TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES AND PROJECTIONS INTO THE FUTURE WITH ACCURACY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THE APPROVAL BY THE COURT OF THIS PLAN DOES NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE PLAN OR GUARANTEE THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

THE DEBTOR BELIEVES THAT THE PLAN WILL PROVIDE CLAIMANTS WITH AN OPPORTUNITY ULTIMATELY TO RECEIVE MORE THAN THEY WOULD RECEIVE IN A LIQUIDATION OF THE DEBTOR'S ASSETS, AND SHOULD BE ACCEPTED. CONSEQUENTLY, THE DEBTOR URGES THAT CLAIMANTS VOTE FOR THE PLAN.

DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS CORRECT, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE. THE STATEMENTS CONTAINED IN THIS PLAN ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN.

## ARTICLE IV

### FINANCIAL PICTURE OF THE DEBTOR

In December 2011, Kevin Russel ("K. Russell"), Charles Neuberger ("Neuberger") Benjamin Poole ("Poole") and Brad Thiessen (Theissen") met in Houston to discuss the advantages of Compressed Natural Gas (CNG) and the opportunities in the CNG Refueling market. They identified that there was a shortage of high-quality stations and decided to move forward together to explore the possibilities. They also discussed the idea of building and owning their own pipelines. It was decided that they would register the company name with the State and came up with the name Independence Fuel Systems LLC (IFS). K. Russell who came with a midstream and exploration

background would be the CEO and be responsible for fundraising, Neuberger who came from Natural Gas Trading and distribution would be President and would be responsible for using his professional contacts to locate pipelines that could be tapped. Poole an attorney would act as General Counsel; and, Theissen with 20+ years in professional mechanics would be responsible for station design and building.

In April 2012 the parties, along with others, met again and discussed the overall strategy of building fueling stations to refuel commercial fleet vehicles, and building the pipelines to supply the required Natural Gas to be compressed and sold. They decided that building its own pipelines would provide IFS the opportunity to bring in a higher quality gas, at a much higher pressure, while requiring less compression to bring it to dispensing pressure. Building its own pipelines would also allow IFS sell the stations separately from pipeline, and continue to sell Natural Gas to the stations if the stations were sold to third parties. Raymond Russel (R.Russell") was brought in to be the CFO, Matt Russel ("M.Russell") was the Director of Gas Marketing, and David Holy ("Holy") was brought in for construction experience. This larger group would be called the Founding Members.

The original Board of Managers consisted of K. Russell as its Chairman, Poole, Neuberger, and Bryan Lowrance ("Lowrance") . The Company had no employees and only Thiessen and three maintenance personnel as independent contractors.

In 2012, K. Russel began raising money for equipment and construction costs by selling membership interests by diluting the "Founding Members Interest." Thiessen and Holy immediately started researching the best equipment manufacturers and the best design practices, and they created the initial design our first station.

The approximate starting and completion dates for each station are as follows:
131 Pittman Rd, construction began November 2012 and was completed in June 2013;
1090 US-59 Carthage, construction began in August 2013 and was completed January 2014;
902 Mobile Dr, construction began January 2014 and was completed April 2015; and,

In May of 2015, IFS entered into individual station agreements with US Venture ("Gain") to act as a marketing arm for three of four of its existing stations (Centerville was under construction at that time), and moving forward together on all future stations. The agreements would allow Gain to bring in their own Point of Sale and Sell Gas to Gain and IFS customers thru IFS's gas compressor and dispensing systems. This should have significantly reduced IFS's accounting workload and leveraged its exposure in the CNG market. Additionally, IFS would see 100% of its COG's paid and be guaranteed royalties at every station every month.

50 W. I-45 Centerville, construction Began May 2015 and was completed October 2015.

Once the project was completed in Centerville, the last members meeting was 2016 during which a petition to borrow $3.5M was presented, voted upon, and approved by the Members and the Board of Managers. Neither the Board of Managers nor the members ever received a petition

(consequently, there was no approval) to borrow an additional $1.5M (and, IFS never saw the proceeds from the second loan).

The two additional stations were begun in earnest after the first loan:

Hw83 Laredo; construction began June 2016 and was completed October 2016; and,
Lancaster Rd, construction began March 2018 and was completed June 2018.

Once construction was competed at the Lancaster Rd station, fuel volumes continued to increase and there were no indications of any issues facing IFS. Again, IFS had not had a meeting of the members or a board meeting at this point since 2016.

Volumes and COVID:

IFS remained in operations on all six CNG Stations with continuous growth from just over 1200 Gas Gallon Equivalent (GGE) in its first month of operation to a peak of more than 3000 GGE per day. During the COVID Pandemic, IFS saw a decrease in traffic as trucking companies laid off employees and some trucking companies went out of business. Traffic varied month-to-month with the volumes falling from 70-80K GGE to a low if 37K GGE in April of 2020.

On average between January of 2020 and January 2021 IFS volumes ran between 40K and 45k GGE per month, this volume should have been enough to pay the COG's and the OpEx. IFS started to see growth again as it picked additional customers bringing IFS back up to pre-pandemic volumes. The CEO/Chairman of the Board did not call a Member meeting or a Board meeting to address any of the COVID related issues.

Eastman Rd Shutdown:

The growth continued thru April of 2022, when IFS's second highest grossing station at 131 Pittman Rd. was shut down by our Gas Supplier, Eastman Midstream LP ("Eastman"), a company owned and managed by K. Russell, R. Russell and M. Russell. Eastman's gas plant was shut down by the company they leased their Natural Gas compressors from.  It is alleged that the leasing company turned off the leased compressor because they had not been paid their lease fees by Eastman. To be clear, IFS was current in paying Eastman its invoices. This shutdown left IFS stranded without a source of gas to compress and dispense. Eastman's managers stated nearly daily that the shutdown would end in a day or two. While IFS did its best to keep its customers informed of the shutdown, the damage was done. The shutdown lasted from approximately April 4, 2022 to May 26, 2022, just shy of two months. As the old adage shows – people will leave a shut station to find a new one and won't necessarily return when their old station comes back on-line. When IFS

finally reopened, it had lost approximately 75% of that Station's traffic. While IFS still continues to recover the lost volumes, it is running at 60% of the pre-shutdown volumes.

In June 2022, through a deposition in a different matter, several Members discovered that IFS was involved in an impending Receivership Judgement. Not only did the two Board of Managers who were involved in the loans acquisition nor the IFS' officers tell the Members that they took out a second loan with Origin Bank (Origin"), and neither loan had been serviced for a couple of years. The two Board Managers, who were involved in the loans acquisition failed to tell the IFS officers and Members that they took out a second loan with Origin Bank ("Origin") and those two Board Managers failed to tell the rest of the Company that they failed to service the loans for the past couple of years and consequently IFS was on the brink of being pushed into a forced receveivership.

Immediately after learning of the impending receivership and the second loan, the Members of IFS forced the resignation of the Chairman of the Board of Managers/CEO and the Board Member/General Counsel and held a Special Meeting of the Members. The purpose of Special Meeting was to expand and to elect a new Board of Managers to run and protect the company. The newly elected Board of Managers consisting of Neuberger (Chairman), Thiessen, Holy, Duane Herbst, and Lowrance.

After reviewing the information regarding the state of the company and the impending Receivership Judgement, new Board decided that the only way to save the company for its employees and its Members was to file for a Chapter 11, subchapter V bankruptcy. As soon as practicable, the new Board of Managers terminated the employment of its General Counsel, CFO, and Director of Marketing due to alleged accounting irregularities and trust issues. Those issues were reinforced with the discovery of two payments being paid directly from IFS Bank Accounts to pay for Eastman's Compressor totaling more than $64,000. One of those payments being made unilaterally by the CFO without direction or notifying the then acting CEO, Neuberger. Additionally, review of the IFS books has shown the company was hemorrhaging money in suspicious ways immediately prior to its declaring bankruptcy.

IFS continues to operate more than 3 months post-bankruptcy petition, having stopped the unnecessary spending on numerous items and unused warehousing that only appeared to benefit Eastman. IFS is currently reviewing the accounting books and bank records and it will continue to identify many irregularities that it is researching further.

## Future Income and Expenses Under the Plan

The Debtor filed this case on July 13, 2022 and has continued to operate the business.

Post petition the current management has maintained operations and has paid all its post petition debts as they have become due. Attached hereto as Exhibit "A" are projections of gross income, expenses and operating income for the next year. It is anticipated that after confirmation, the Debtor will continue in business. Based upon the projections, the Debtor believes it can service the debt to the creditors.

The Debtor has also instituted a lawsuit against its primary secured creditor Origin Bank ("Bank") seeking a declaratory judgement of its lien position as well as damages for actions taken by the Bank.

### Post-Confirmation Management

The Debtor is currently owned 42 owners with various ownership percentages. At the present time the CEO of the company is Brad Thiessen. Upon confirmation all ownership interest will be maintained. Mr Thiessen will remain the CEO. Mr. Thiessen will receive an annual salary of $84,000.

## ARTICLE V

### ANALYSIS AND VALUATION OF PROPERTY

The Debtor operates six unmanned compressed natural gas filling stations in Texas. The Debtor's assets are consist mainly of the structures and the equipment necessary to provide the fueling services.

The value of the Debtor's assets, if liquidated, would not provide a greater dividend to the unsecured creditors than proposed under this Plan.

A liquidation analysis of the Debtor's assets is attached hereto as **Exhibit "B".**

## ARTICLE VI
### SUMMARY OF PLAN OF REORGANIZATION

The Debtor will continue in business. The Debtor's Plan will break the existing claims into 8 categories of Claimants. These claimants will receive cash payments over a period of time beginning on the Effective Date.

**Satisfaction of Claims and Debts**: The treatment of and consideration to be received by holders of Allowed Claims or interests pursuant to this Article VI of this Plan shall be the sole an exclusive means for full settlement, release and discharge of their respective Claims, Debts, or interests. On the Confirmation Date, the Reorganized Debtor shall assume all duties, responsibilities and obligations for the implementation of this Plan. Any class of Claimants failing to vote on this Plan shall be deemed to have accepted this Plan in its present form or as modified or amended as permitted herein.

**Class 1 Claimants (Allowed Administrative Claims of Professionals and Subchapter V Trustee)** are unimpaired and will be paid in cash and in full on the Effective Date of this Plan. Professional fees are subject to approval by the Court as reasonable. Debtor's attorney's fees approved by the Court and payable to the law firm of Eric Liepins, P.C. will be paid immediately following the later of Confirmation or approval by the Court out of the available cash. The Debtor has also employed Special Counsel to handle its normal corporate matter and special counsel to handle litigation matters. There fees will be subject to bankruptcy court approval. The Subchapter V Trustee fees will be paid immediately following the later of Confirmation or approval by the Court out of the available cash. The Debtor's case will not be closed until all allowed Administrative Claims are paid in full. Class 1 Creditor Allowed Claims are estimated as of the date of the filing of this Plan to not exceed the amount of $35,000.

The Class 1 Claimants are not impaired under this Plan.

**Class 2 Claimants (Allowed Priority Tax Creditor Claims)** are impaired and shall be satisfied as follows: Leon County has filed a Proof of Claim for tax year 2022 for business property taxes in the total amount of $7,708.60. Panola County has filed a Proof of Claim for tax year 2022 for business property taxes in the amount of $15,947.04. Gregg County has filed a Proof of Claim for tax year 2022 for business property taxes in the amount of $9,817.38. Pine Tree ISD has filed a Proof of Claim for tax year 2022 for business property taxes in the amount of $4,084.60 ("Ad Valorem Tax Claims"). The Allowed Ad Valorem Tax Creditor Claims on shall be paid in 48 equal monthly installments commencing on the Effective Date. The Ad Valorem Taxes will receive post-petition pre-Effective Date interest at the state statutory rate of 12% per annum and post-Effective Date interest at the rate of 12% per annum. The Taxing Authorities shall retain their statutory senior lien position regardless of other Plan provisions, if any, to secure their Ad Valorem Tax Claims until paid in full as called for by this Plan.

Class 2 creditors are impaired under this Plan.

**Class 3 (Allowed Priority Claim of Internal Revenue Service)** is impaired and shall be satisfied as follows: The Internal Revenue Service ("IRS") has filed a Priority Proof of Claim against Fischer in the amount of $12,214.24.[1] The Debtor would show some of this claim was based upon some unfiled returns which have all been filed. Based upon the returns the Debtor expect this claim to be lower. The Debtor shall pay the IRS Priority Claim in 60 equal monthly payments commencing on the Effective Date with interest at the rate of 3% per annum. It is the Debtor's intention to file all past due returns prior to confirmation. Based upon a review of his records, at the present time Debtor does not anticipate owning any additional taxes.

a. **Events of Default.** The occurrence of any of the following shall constitute an event of default under the Plan as to Class 3 Claimant:

---

[1] The balance of the IRS claim shall be treated as a general unsecured claim.

DEBTOR'S PLAN OF REORGANIZATION PURSUANT TO SECTION 1190 OF THE BANKRUPTCY CODE DATED OCTOBER 12, 2022 - Page 12

1) **Failure to Make Payments.** Failure of the Debtor to meet the payment obligations set forth in the Plan shall constitute an event of default under the Plan. In addition, upon a default under the Plan, the administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of a Federal (or state) tax lien and the powers of levy, seizure, and sale under the Internal Revenue Code.

(A) If the Debtor fails to make any plan payment, or deposits of any currently accruing employment or sales tax liability; or fails to make payment of any tax to the IRS within (ten) 10 days of the due date of such deposit or payment, or if the Debtor fails to file any required federal or state tax return by the due date of such return, then the United States may declare that the Debtor is in default of the Plan. Failure to declare a default does not constitute a waiver by the United States of the right to declare that the Debtor is in default.

(B) If the United States declares the Debtor to be in default of the Debtor's obligations under the Plan, then the entire imposed liability, together with any unpaid current liabilities, may become due and payable immediately upon written demand to the Debtor.

(C) If a payment is not made within twenty (20) days of such demand, then the IRS may collect any unpaid liabilities through the administrative collection provisions of the Internal Revenue Code. The IRS shall only be required to send two notices of default, and upon the third event of Default the IRS may proceed to collect on all amounts owed without recourse to the Bankruptcy Court and without further notice to the Debtor. The collection statute expiration date will be extended from the Petition Date until substantial default under the Plan. All payments will be sent to: IRS, Attn: Insolvency, 1100 Commerce Street, Mail Code 5027DAL, Dallas, Texas 75242.

(D) The IRS shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor to the IRS. The IRS may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor to the IRS; but the IRS shall not take action to actually collect from such persons unless and until there is a default under the Plan and as set forth above.

The Class 3 creditor is impaired under this Plan.


**Class 4 (Allowed Landlord Arrearage Claims)** are impaired and shall be satisfied as follows: the debtor leases its facilities. As of the Petition date, to landlords, Eastern Fuel, LLC and Eastern Fuel Properties, LLC have filed Proof of Claim asserting pre-petition arrearage. The Debtor shall pursuant the terms of this Plan assume all existing real property leases. The Debtor shall cure any Allowed Arrearage Claims in two equal payments. The first payment shall be paid 30 days after the Effective Date and the second payment shall 60 days thereafter.

The Class 4 creditor is impaired under this Plan.

**Class 5 (Allowed Secured Claims of Origin Bank)** is impaired and shall be satisfied as follows: The Debtor executed the following Loan Documents[2] in favor of Origin Bank ("Origin":

Loan Agreement dated July 26, 2016;

First Amendment to Loan Agreement dated July 25, 2017;

Advance Promissory Note dated July 26, 2016 in the original principal amount of $3,500,000;

Advance promissory Note dated July 26., 2016 in the original principal amount of $1,500,000;

Security Agreement dated July 26, 2016;

Collateral Assignment of Royalty Agreements dated July 26, 2016;

Collateral Assignment of Leases dated July 26, 2016;

Restated Collateral Assignment of Royalty Agreement dated July 25, 2017;

Restated Collateral Assignment of Leases dated July 25, 2017;

UCC-1 Financing Statement filed August 10, 2016 with Texas Secretary of State Filing number 16-0026283583; and

UCC-1 Financial Statements filed September 20, 2021 with the Texas Secretary of State file number 21-0043072625.

Origin has filed a Secured Proof of Claim in the amount of $5,087645.70.

Origin has filed a secured Proof of Claim in the amount of $5,087, 645.70. As set forth above the Debtor has filed an Adversary Proceeding against Origin styled <u>Independence Fuel Systems, LLC v. Origin Bank</u>, case 22-06007, United Sates Bankruptcy Court, Eastern District of Texas, Tyler Division ("Adversary Proceeding"). The Debtor would show that the value of the collateral securing any Origin debt is $450,000. Origin shall have a secured claim of up to $450,000 upon a determination of the validity of the Origin Claim under the Adversary Proceeding. Debtor shall pay the Allowed Origin Secured Claim in 60 equal monthly installments with interest at the rate of 5% per annum. The balance of any Allowed Origin Claim shall be treated as an unsecured creditor

---

[2] The Debtor disputes that all the Loan Documents executed were authorized by the Debtor and this Plan is without waiver of any of the claims asserted by the Debtor against Origin in Adversary case Number 22- 06007.

DEBTOR'S PLAN OF REORGANIZATION PURSUANT TO SECTION 1190 OF THE BANKRUPTCY CODE DATED OCTOBER 12, 2022 - Page 14

under this Plan. To the extent Origin has an Allowed Secured Claim it current liens shall remain in full force and effect until the Allowed Origin Secured Claim as been paid in full.

The Class 5 creditor is impaired under this Plan.

**Class 6 Claimants (Allowed Unsecured Claims)** are impaired and shall be satisfied as follows: All unsecured creditors, other than Class 7 Unsecured Creditors, shall share pro rata in the unsecured creditors pool. The Debtor shall make monthly payments commencing thirty (30) days after the Effective Date of $1,500 into the unsecured creditors' pool. The amount represents the Debtor's disposable income as that terms is defined in 11 U.S.C. § 1191(d). The Debtor shall make distributions to the Class 6 creditors every 90 days commencing 90 days after the first payment into the unsecured creditors pool. The Debtor shall make up to 60 payments into the unsecured creditors pool.

The Class 6 creditors are impaired.

**Class7 Claimants (Allowed Insider Claims)** are impaired and shall be satisfied as follows: All Allowed Claims of Debtor's former management[3] and their related companies[4], including without limitation, the Allowed Claims of Raymond Russell, Matt Russell, Richard Russell, Eastman Midstream, LP, Benton Poole, Sovereign Land Company, LLC, and Toledo Gas Gathering, LLC, shall be subordinated to the Class 6 creditor claims. All Allowed Class7 Claims shall share paid pro rata in Debtor's Disposable Income after all Allowed Class 6 creditors have been paid in full. The Allowed Class 7 Claims shall be entitled to receive any of the remaining 60 monthly payments after the Class 6 creditors have been paid in full.

The Class 7 creditors are impaired under this Plan.

**Class 8 ( Current Owner)** is not impaired under the Plan and shall be satisfied as follows: The current owner will receive no payments under the Plan, however, they will be allowed to retain their ownership in the Debtor.

Class 8 Claimants are not impaired under the Plan.

### ARTICLE VII
### MECHANICS/IMPLEMENTATION OF PLAN

---

[3] Former Management shall mean any officer, director, shareholder, Member who held that position prior to July 1, 2022.

[4] Related companies shall mean any company owned in whole or in part for any member of former management.

Debtor anticipates the continued operations of the business to fund the Plan.

## ARTICLE VIII.
## FEASIBILITY OF PLAN

The projections of the future business operations are attached hereto as Exhibit "A". The Debtor believes that the projections are accurate based upon the historical operations of the business. Based upon the projections, the Debtor believes the Plan to be feasible.

## ARTICLE IX
## RETENTION OF JURISDICTION

The Bankruptcy Court's jurisdiction to enforce or interpret this Plan shall be retained under the Plan.

## ARTICLE X.
## ALTERNATIVES TO DEBTOR'S PLAN

If the Debtor's Plan is not confirmed, the Debtor's bankruptcy case may be converted to a case under Chapter 7 of the Code, in which case a trustee would be appointed to liquidate the assets of the Debtor for distribution to its Creditors in accordance with the priorities of the Code. Generally, a liquidation or forced sale yields a substantially lower amount. In Debtor's case the assets have a value of $450,000. At a forced sale the Debtor believes the actual amount received would be less. The amount owed to the secured and tax creditors is asserted to be greater than $5,000,000, therefore, a liquidation would not result in a distribution to the unsecured creditors.

A liquidation analysis is attached hereto as Exhibit "B".

## ARTICLE XI
## STATUS OF EXECUTORY CONTRACTS AND LEASES

All unexpired leases and executory contracts shall be assumed on or before the Effective Date. To the extent there are any unexpired leases or executory contracts, which have not been assumed or dealt with in this Plan or Court Order prior to the Effective Date, they are rejected except the current leases with Debtor's Landlords and the Debtor current contracts for the supply and delivery of the compressed natural gas are specifically assumed by this Plan.

## ARTICLE XII

**EVENTS OF DEFAULT AND EFFECT THEREOF**

Unless expressly provided herein to the contrary, no Claimant shall have the right to enforce any rights under this Plan until the Reorganized Debtor fails to cure any default hereunder within fifteen (15) days of receipt of written notice of such default to Reorganized Debtor at Brad Thiessen at brad@absolutesign.net. The Debtor will be entitled to no more than two (2) notice of default during the term of the Plan from any creditor. Upon a third default to that creditor, the automatic stay as to that creditor shall be automatically terminated.

## ARTICLE XIII
## DISCHARGE

Upon Confirmation pursuant to 11 U.S.C. §1191(a) to the extent that a Claim or Debt has been dealt with under this Plan, such Claim or Debt will be discharged. Upon confirmation pursuant to 11 U.S.C. § 1191(b) discharge shall occur upon completion of all payments required under this Plan.

The automatic stay imposed by Section 362 of the Code or any preliminary injunction granted by the Court to allow for Substantial Consummation of this Plan shall remain in effect until the Effective Date.

## ARTICLE XIV
## RISKS TO CREDITORS UNDER THE DEBTOR'S PLAN

Claimants and Equity Interest Holders should be aware that there are a number of substantial risks involved in consummation of the Plan. The Plan contemplates that there will be excess funds to pay Creditor Claims.

## ARTICLE XVI
## TAX CONSEQUENCES TO THE DEBTOR

Implementation of the Plan may result in federal income tax consequences to holders of Claims, Equity Interest Holders, and to the Debtor. In this case all creditors will be paid in full the amount of their claims. Tax consequences to a particular Creditor or Equity Interest Holder may depend on the particular circumstances or facts regarding the Claim of the Creditor or the interests of the Equity Interest Holder. **CLAIMANTS ARE URGED TO CONSULT THEIR OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE AND LOCAL TAX LAWS.**

## ARTICLE XVII
### PENDING OR ANTICIPATED LITIGATION

The Debtor has evaluated potential claims which may be brought. The Debtor believed that the claims asserted in the Adversary Proceeding could result in additional funds to the Debtor. The Debtor also believes that certain causes of action currently exist against former management of the Debtor. The Debtor has not yet made a determination of whether to pursue any such claims, but the Debtor reserves the right to pursue any claims against former management or any company owned in whole or in part by former management.

Dated: October 12, 2022.

Respectfully submitted,

Independence Fuel Systems, LLC

By: Brad Thiessen
Its: CEO

## LIQUIDATION ANALYSIS

| ASSETS | Chapter 7 | Chapter 11 |
|---|---|---|
| 131 Pittman Rd, Longview TX | 60,000[1] | 75,000 |
| 1090 US 59, Carthage TX | 60,000 | 75,000 |
| 902 Mobile Dr, Longview, TX | 60,000 | 75,000 |
| 350 S I-45, Centerville, TX | 60,000 | 75,000 |
| 15879 US 83, Laredo TX | 60,000 | 75,000 |
| 8181 S Lancaster RD, Dallas TX | 60,000 | 75,000 |

| LIABILITIES | | |
|---|---|---|
| ADMINISTRATIVE | | |
| TAX CREDITORS | 49,000 | 49,000 |
| SECURED | 5,000,000 | 450,000 |
| UNSECURED NON INSIDER | 225,000 | 4,775,000 |
| UNSECURED INSIDER | 1,200,000 | 1,200,000 |
| | | |
| DIVIDEND | %0 | 3% |

---

[1] Properties are valued at 80% of their current value in a Chapter 7 to account for a forced sale and removal costs.

| INCOME | Jan | Feb | Mar | Apl | May | Jun | Jly | Aug | Sep | Oct | Nov | Dec | total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Monthly Income (GAIN) | $ 117,812.50 | $ 119,104.50 | $ 120,411.44 | $ 121,733.51 | $ 123,070.87 | $ 124,423.72 | $ 125,792.22 | $ 127,176.97 | $ 128,276.97 | $ 129,993.58 | $ 131,426.61 | $ 132,876.25 | $ 1,502,099.14 |
| Monthly Income (COL) | 14,822.50 | 14,822.50 | 14,822.50 | 14,822.50 | 14,822.50 | 14,822.50 | 14,822.50 | 14,822.50 | 14,822.50 | 14,822.50 | 14,822.50 | 14,822.50 | 177,870.00 |
| Monthly RINS | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 4,000.00 | 48,000.00 |
| Monthly FTR | 2,565.00 | 2,565.00 | 2,565.00 | 2,565.00 | 2,565.00 | 2,565.00 | 2,565.00 | 2,565.00 | 2,565.00 | 2,565.00 | 2,565.00 | 2,565.00 | 30,780.00 |
|  | 139,200.00 | 140,492.00 | 141,798.94 | 143,121.01 | 144,458.37 | 145,811.22 | 147,179.72 | 148,564.47 | 149,664.47 | 151,381.08 | 152,814.11 | 154,263.75 | $ 1,758,749.14 |
| Natural Gas (Gain) | 52,500.00 | 53,130.00 | 53,767.56 | 54,412.77 | 55,065.72 | 55,726.51 | 56,395.23 | 57,071.97 | 57,756.84 | 58,449.92 | 59,151.32 | 59,861.13 | 673,288.97 |
| Electricity (Gain) | 16,000.00 | 16,080.00 | 16,160.40 | 16,241.20 | 16,322.41 | 16,404.02 | 16,486.04 | 16,568.47 | 16,651.31 | 16,734.57 | 16,818.24 | 16,902.33 | 197,368.99 |
| Station Communication (Gain) | 812.50 | 812.50 | 812.50 | 812.50 | 812.50 | 812.50 | 812.50 | 812.50 | 812.50 | 812.50 | 812.50 | 812.50 | 9,750.00 |
| Natural Gas (COL) | 7,300.00 | 7,300.00 | 7,300.00 | 7,300.00 | 7,300.00 | 7,300.00 | 7,300.00 | 7,300.00 | 7,300.00 | 7,300.00 | 7,300.00 | 7,300.00 | 87,600.00 |
| Electricity (COL) | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 2,200.00 | 26,400.00 |
| Station Communication (COL) | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 162.50 | 1,950.00 |
| Heartland 3rd Party Credit Card Processor (COL) | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 350.00 | 4,200.00 |
| State and Fed Excise Tax (COL) | 810.00 | 810.00 | 810.00 | 810.00 | 810.00 | 810.00 | 810.00 | 810.00 | 810.00 | 810.00 | 810.00 | 810.00 | 9,720.00 |
| Stations Rents | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 9,000.00 | 108,000.00 |
| Station Royalties | 1,500.00 | 1,560.00 | 1,622.40 | 1,687.30 | 1,754.79 | 1,824.98 | 1,897.98 | 1,973.90 | 2,052.85 | 2,134.97 | 2,220.37 | 2,309.18 | 22,538.72 |
| Property taxes | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 36000 |
| Operating Expense: |  |  |  |  |  |  |  |  |  |  |  |  |  |
| City of Centerville water/trash | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 150.00 | 1,800.00 |
| Office Expense | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 1,000.00 | 12,000.00 |
| Equipment, General Liability, Excess, etc | 5,005.00 | 5,005.00 | 5,005.00 | 5,005.00 | 5,005.00 | 5,005.00 | 5,005.00 | 5,005.00 | 5,005.00 | 5,005.00 | 5,005.00 | 5,005.00 | 60,060.00 |
| Truck Insurance (one truck) | 233.40 | 233.40 | 233.40 | 233.40 | 233.40 | 233.40 | 233.40 | 233.40 | 233.40 | 233.40 | 233.40 | 233.40 | 2,800.80 |
| Salaries | 24,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | 24,000.00 | 288,000.00 |
| Employer Portion of Payroll taxes | 1,491.75 | 1,491.75 | 1,491.75 | 1,491.75 | 1,491.75 | 1,491.75 | 1,491.75 | 1,491.75 | 1,491.75 | 1,491.75 | 1,491.75 | 1,491.75 | 17,901.00 |
| Contract Labor | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 2,000.00 | 24,000.00 |
| TX Workforce | 348.00 | 348.00 | 348.00 | 348.00 | 348.00 | 348.00 | 348.00 | 348.00 | 348.00 | 348.00 | 348.00 | 348.00 | 4,176.00 |
| Site Maintenance | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 1,500.00 | 18,000.00 |
|  | $ 129,363.15 | $ 130,133.15 | $ 130,913.51 | $ 131,704.42 | $ 132,506.07 | $ 133,318.66 | $ 134,142.40 | $ 134,977.49 | $ 135,824.15 | $ 136,682.61 | $ 137,553.08 | $ 138,435.79 | $ 1,605,554.48 |

Plan payments

| | Jan | Feb | Mar | Apl | May | Jun | Jly | Aug | Sep | Oct | Nov | Dec | total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ad valorem | 989 | 989 |  | 989 | 989 | 989 | 989 | 989 | 989 | 989 | 989 | 989 | 11868 |
| irs | 220 | 220 |  | 220 | 220 | 220 | 220 | 220 | 220 | 220 | 220 | 220 | 2640 |
| Landlords |  | 3350 |  | 3350 |  |  |  |  |  |  |  |  | 6700 |
| origin | 8492 | 8492 |  | 8492 | 8492 | 8492 | 8492 | 8492 | 8492 | 8492 | 8492 | 8492 | 101904 |
| unsecured | $ 1,500.00 | $ 1,500.00 |  | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 1,500.00 | $ 18,000.00 |
|  | $ 11,201.00 | $ 14,551 |  | $ 11,201 | $ 11,201.00 | $ 11,201.00 | $ 11,201.00 | $ 11,201.00 | $ 11,201.00 | $ 11,201.00 | $ 11,201.00 | $ 11,201.00 | $ 141,112.00 |